# United States District Court

### EASTERN DISTRICT OF TEXAS
### SHERMAN DIVISION

| | | |
|---|---|---|
| DANIELLE GEOFFRION and | § | |
| DARREN KASMIR | § | |
| | § | |
| v. | § | Case No. 4:14-CV-350 |
| | § | Judge Mazzant |
| NATIONSTAR MORTGAGE LLC | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's Renewed Motion for Judgment as a Matter of Law, Motion to Alter or Amend Judgment, and Alternatively, Motion for New Trial (Dkt. #89). After considering the relevant pleadings and the relevant trial testimony and evidence, the Court finds that Defendant's motion for judgment as a matter of law is denied.

## PROCEDURAL BACKGROUND

In the parties' Joint Final Pretrial Order, Plaintiffs Danielle Geoffrion ("Geoffrion") and Darren Kasmir ("Kasmir") (together, "Plaintiffs") accuse Defendant Nationstar Mortgage LLC ("Defendant" or "Nationstar") of violating the Real Estate Settlement Procedures Act 12 U.S.C. ¶ 2605(e) ("RESPA") (Dkt. #64 at p. 2). Plaintiffs allege that they sent Defendant Qualified Written Requests ("QWRs") for information regarding their Nationstar Mortgage Account (the "Account") on at least six occasions (Dkt. #64 at p. 3 n. 3). Plaintiffs allege that Defendant "failed to provide information required by federal law." (Dkt. #64 at p. 2). Plaintiffs "also sued in equity to receive [an] accounting from Defendant." (Dkt. #64 at p. 2).[1]

Defendant maintains that Plaintiffs' letter to Defendant "did not trigger any obligation under the law[.]" (Dkt. #64 at p. 3). Defendant contends that "the communications Plaintiffs sent

---

[1] Plaintiffs also brought a breach of contract claim against Defendant (Dkt. #64 at p. 2). Defendant asserted that Plaintiffs breached their contract with Defendant, "prior to any alleged breach by Defendant" (Dkt. #64 at p. 3). However, Plaintiffs dropped this claim before trial (Dkt. #89 at p. 1).

do not meet the statutory definition of QWRs, were not sent to the address to which such requests must be sent to trigger an obligation to respond, and were overly broad, unduly burdensome, and sought 'discovery type' information regarding Plaintiffs' account." (Dkt. #64 at p. 3). Defendant also argues that "Plaintiffs have not been damaged in a fashion to entitle them to recover damages in this lawsuit[.]" (Dkt. #64 at p. 3). Defendant further alleges that "the accounting claim is not well-founded because there is no issue of sufficient complexity to justify relief per that claim." (Dkt. #64 at p. 3).

The trial began on September 9, 2015. On September 10, 2015, Defendant moved for judgment as a matter of law as to the RESPA claim after Plaintiffs rested (Trial Tr. 9/10/15 at 92:6-94:10).

Defendant based the motion on its contention that the letters to which Defendant did not respond did not constitute QWRs and that Defendant adequately responded to the December 16, 2013 communication that Plaintiffs sent (Trial Tr. 9/10/15 at 92:7-93:3). Defendant also asserted that Plaintiffs failed to establish actual damages, and that mental anguish damages are not recoverable under RESPA (Trial Tr. 9/10/15 at 93:4-94:10). Plaintiffs asserted that there was adequate evidence for the jury to determine that the relevant communications constituted QWRs (Trial Tr. 9/10/15 at 94:12-95:2). Plaintiffs also maintained that there was sufficient evidence upon which a jury could base findings of actual damages and that RESPA provides for the recovery of mental anguish damages (Trial Tr. 9/10/15 at 95:3-96:16).

On September 10, 2015, the jury rendered a verdict finding that Plaintiffs submitted QWRs to Defendant on December 16, 2013 (the "December 16 Communication"), and on January 3, 2014 (the "January 3 Communication") (Dkt. #76 at p. 1). The jury also found that Defendant failed to respond or provided an inadequate response to the January 3 Communication

(Dkt. #76 at p. 2). The jury found that Plaintiffs were entitled to recover damages caused by Defendant's failure to respond to Plaintiffs' written inquiry, in the amounts of $23,500 for pecuniary loss and $151,500 for mental anguish that Plaintiffs suffered in the past (Dkt. #76 at p. 3). The jury verdict also stated that Defendant engaged in a pattern or practice of noncompliance with the requirements of RESPA and that Plaintiffs were entitled to an accounting of the Account (Dkt. #76 at pp. 4-5).

On October 12, 2015, Defendant filed its Renewed Motion for Judgment as a Matter of Law, Motion to Alter or Amend Judgment, and Alternatively, Motion for New Trial (Dkt. #89). On October 26, 2015, Plaintiffs filed their response (Dkt. #91). On October 30, 2015, Defendant filed its reply (Dkt. #94).

## FACTUAL BACKGROUND

At trial, Kasmir testified that he and Geoffrion moved to Los Angeles to pursue his career in film (Trial Tr. 9/9/15 at 17:16-18:21). After about five years in the area, Plaintiffs began looking to buy a home (Trial Tr. 9/9/15 at 18:22-19:3). Plaintiffs bought a house through a conservatorship sale and then spent a considerable amount of time updating the home (Trial Tr. 9/9/15 at 19:7-22:24). In 2004, Plaintiffs refinanced the house because the property value had increased and they wanted to put more finances into home improvements (Trial Tr. 9/9/15 at 22:25-23:8). In 2012, Plaintiffs moved to Houston because their niece was seriously ill (Trial Tr. 9/9/15 at 25:4-27:12, 82:22-84:1). The mortgage was assigned to a variety of companies over several years, but it was eventually assigned from Bank of America to Defendant on July 1, 2013 (Trial Tr. 9/9/15 at 23:9-19).

Plaintiffs continued to make automatic payments to Bank of America until payments were returned to them in October 2013 (Trial Tr. 9/9/15 at 28:22-29:22, 100:3-101:3). Plaintiffs

then tried to send payments to Defendant but the payments were sent back (Trial Tr. 9/9/15 at 29:23-30:16). In late October or early November 2013, Plaintiffs called Defendant and began speaking with and sending faxes to a couple of different individuals within the company. Over the next several weeks Plaintiffs spoke to different individuals within Nationstar on several different occasions. *See* Trial Tr. 9/9/15 at 30:21-32:22 (Kasmir testified that he spoke with someone named Carla who told him to contact her through her direct phone line and fax number); Trial Tr. 9/9/15 at 39:7-17 (Kasmir testifying that when he tried calling Carla on the direct phone line he was given, he instead spoke to someone named Adrian); Trial Tr. 9/9/15 at 43:15-44:12 (Kasmir stating that he spoke to someone named Garrett). Plaintiffs were told to send documentation of their payments, which they did repeatedly because they were told that their previous communications had not been received. *See* Trial Tr. 9/9/15 at 33:6-36:2 (Kasmir explaining that he sent Carla an authorization for him to speak with Defendant's employees about the loan, bank records, and a request for clarification); Trial Tr. 9/9/15 at 36:3-38:2 (Kasmir stating that he never heard back from Carla and sent her another communication on November 14, 2013); Trial Tr. 9/9/15 at 39:18-22 (Kasmir testifying that Adrian said that he saw no records of any faxes being received, so he faxed Adrian on November 19, 2013).

Plaintiffs were assured that research was being done and that they would hear from Defendant about the matter, only to hear nothing (Trial Tr. 9/9/15 at 33:6-36:2). Plaintiffs were also told, by different people within Nationstar, that they were behind on their payments by vastly different amounts. *See* Trial Tr. 9/9/15 at 44:13-45:4 (Kasmir stating that they were initially told by Carla or Adrian that they were approximately $40,000 behind on payments); Trial Tr. 9/9/15 at 43:15-44:12 (Kasmir explaining that Garrett told him that Plaintiffs were $76,000 behind on their mortgage); Trial Tr. 9/9/15 at 44:10-13 (Kasmir testifying that Plaintiffs

received a demand letter that stated that they owed $44,000). At one point Kasmir was informed that an escrow account was attached to Plaintiffs' mortgage because of property taxes, but Plaintiffs were not given details about the escrow account (Trial Tr. 9/9/15 at 47:25- 50:19).

Kasmir stated that Plaintiffs hired an attorney, Sara Fendia ("Fendia"), to help them get an answer about the amount that they owed on the mortgage, and why (Trial Tr. 9/9/15 at 52:23-53:10). Fendia sent the December 16 Communication to Defendant, requesting an accounting of the mortgage (Trial Tr. 9/9/15 at 53:17-55:19). Fendia then got a response in the form of a packet of information (Trial Tr. 9/9/15 at 55:20-25).

Kasmir testified that the packet did not explain why Plaintiffs owed between $40,000 and $75,0000, and it did not explain what happened with the escrow account and taxes (Trial Tr. 9/9/15 at 58:1-59:6). In fact, Kasmir stated that "this package led to more questions than it answered." (Trial Tr. 9/9/15 at 59:7-9). Even after meeting with Fendia, and going through the packet with her, Plaintiffs still did not understand the contents of it (Trial Tr. 9/9/15 at 62:13-21). Therefore, Fendia sent the January 3 Communication to Defendant (Trial Tr. 9/9/15 at 62:22-64:19). Fendia continued to try to communicate with Defendant, but Defendant only responded by sending Fendia refinance applications (Trial Tr. 9/9/15 at 65:23-70:11).

Plaintiffs testified that they would have leased the house while they were staying in Houston to be with their niece, but that they were unable to because of the dispute over the mortgage payment (Trial Tr. 9/9/15 87:8-90:14; 115:2-116:3). Kasmir also testified that Plaintiffs still owned the house, that they had lived there for four months last year, and that they had lived in the house for a few months the previous year (Trial Tr. 9/9/15 at 94:13-95:2). Kasmir stated that they had not made a payment on the loan since 2013 and that Plaintiffs had not paid taxes against the property for at least the last three years (Trial Tr. 9/9/15 at 95:11-17).

Kasmir also said that Defendant had the right to pay taxes assessed against the property under the security instrument (Trial Tr. 9/9/15 at 95:18-22).

Later in the trial, Fay Janati ("Janati), Defendant's corporate respresentative, testified. Janati testified that when she was deposed in April 2015, she was not aware of written policies and procedures for determining whether a borrower's letter qualified as a QWR (Trial Tr. 9/10/15 at 7:18-8:2). She also testified that she did not know the details of Defendant's QWR policy during her deposition, nor did she know if Defendant even had a written policy (Trial Tr. 9/10/15 at 8:13-20). She then said that since her deposition, she had done research and found out that Defendant did have a policy for determining whether or not a letter qualifies as a QWR (Trial Tr. 9/10/15 at 9:3-9:18). Janati conceded that the communications at issue in the current case were sent in the fall of 2013, with the exception of one or two that were sent in January of 2014 (Trial Tr. 9/10/15 at 10:17-11:6). Janati also conceded that the written policy that Defendant eventually produced to Plaintiffs was published on April 6, 2015 (Trial Tr. 9/10/15 at 11:7-15). When asked whether she had previously stated that the policy was in effect in 2013, Janati testified that during her deposition she was confused between "written policies" and "not written policies" (Trial Tr. 9/10/15 at 11:16-13:1). Janati then read from the transcript of her deposition and conceded that when she was asked whether Defendant had a written policy in place in December of 2013, she answered yes (Trial Tr. 9/10/15 at 13:2-6). Janati then testified that Defendant had about 7,000 employees, that it was her job to attend the deposition, and that Defendant had been aware of this lawsuit for almost a year and a half (Trial Tr. 9/10/15 at 13:14-24).

Janati went on to testify that during her deposition, she did not know whether or not Defendant responded to the January 3 Communication (Trial Tr. 9/10/15 at 15:6-17). After

reading aloud her deposition testimony where she had previously stated that she did not know the total amount of the loan as of November 25, 2013, Janati stated that there was too much for her to remember (Trial Tr. 9/10/15 at 18:2-19:9).

Janati continued to discount her previous deposition testimony by arguing that there was too much information for her to know the answers to several questions without reviewing the relevant documentation, and that she was not sure she reviewed the necessary documentation during the deposition (Trial Tr. 9/10/15 18:2-19:9, 20:5-22:8). Janati also testified that her testimony was changing as a result of new information she had learned since her deposition (Trial Tr. 9/10/15 at 9:3-18, 22:9-22:23, 58:21-59:15). Janati also asked to re-review documentation so she could determine if her answers during the deposition were right or wrong (Trial Tr. 9/10/15 at 24:9-26:7). Janati's testimony revealed that she could have accessed or brought the documents that she was requesting to trial (Trial Tr. 9/10/15 at 27:23-34:1).

Upon further questioning, Janati stated that while she had been unsure during her deposition about whether the January 3 Communication was a QWR, she was now sure that it was not a QWR because she had done further research (Trial Tr. 9/10/15 at 58:15-59:15). When asked by the Court how she did not know whether the communications at issue qualified as QWRs during her deposition, Janati only answered, "I'm sorry" (Trial Tr. 9/10/15 at 59:16-60:5). When questioned further, Janati answered, "We do have a --- I am not Customer Relation" (Trial Tr. 9/10/15 at 60:6-60:8). After further questioning from the Court about why her testimony had changed, Janati finally testified that it was based on a conversation she had with "somebody who works for Customer Relationship[.]" (Trial Tr. 9/10/15 at 60:9-61:6).

# LEGAL STANDARD

"A motion for judgment as a matter of law . . . in an action tried by jury is a challenge to the legal sufficiency of the evidence supporting the jury's verdict." *Ford v. Cimarron Ins. Co., Inc.*, 230 F.3d 828, 830 (5th Cir. 2000) (quoting *Jones v. Kerrville State Hosp.*, 142 F.3d 263, 265 (5th Cir. 1998) (quoting *Harrington v. Harris*, 118 F.3d 359, 367 (5th Cir. 1997)) (internal citations omitted). Judgment as a matter of law is only appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). "If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion." Fed. R. Civ. P. 50(b). Therefore, a movant may file a renewed judgment as a matter of law, which may include an alternative or joint request for a new trial under Rule 59, "[n]o later than 28 days after the entry of judgment." *Id.*. "[A] jury verdict must be upheld, and judgment as a matter of law may not be granted, unless 'there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did.'" *Fractus, S.A. v. Samsung Elec. Co., Ltd.*, 876 F. Supp. 2d 802, 813 (E.D. Tex. 2012) (citing *Hiltgen v. Sumrall*, 47 F.3d 695, 700 (5th Cir. 1995)). The jury's verdict must be supported by "substantial evidence" in support of each element of the claims. *Am. Home Assurance Co. v. United Space All.*, 378 F.3d 482, 487 (5th Cir. 2004).

"A court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmoving party; however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury." *Fractus*, 876 F. Supp. 2d at 813; *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-151 (2000). "The moving party is entitled to judgment as a matter of law, 'only if the evidence points so strongly and so

overwhelmingly in favor of the [] moving party that no reasonable juror could return a contrary verdict.'" *SSL Servs., LLC v. Citrix Sys., Inc.*, 940 F. Supp. 2d 480, 486 (E.D. Tex. 2013) (quoting *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011) (alteration in original, citation omitted).

"The court may, on motion, grant a new trial on all or some of the issues[.]" FED. R. CIV. P. 59(a)(1). "[I]f the trial judge is not satisfied with the verdict of a jury, he has the right—and indeed the duty—to set the verdict aside and order a new trial." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985) (citation omitted). In ruling on a motion for new trial, the jury's verdict may not be lightly set aside. *See Ellis v. Weasler Eng'g, Inc.*, 258 F.3d 326, 343 (5th Cir. 2001) ("[C]ourts 'must attempt to reconcile the jury's findings, by exegesis, if necessary, before we are free to disregard the jury's verdict and remand the case for a new trial.'"). "In considering whether the seemingly inconsistent verdicts may be reconciled, the court must view the evidence in the light most favorable to upholding the jury's decision by a finding of consistency." *Id.*; *see Hiltgen*, 47 F.3d at 701.

A Rule 59(e) motion "calls into question the correctness of a judgment." *Templet v. HydroChem Inc.*, 367 F.3d 473, 478 (5th Cir. 2004) (quoting *In re Transtexas Gas Corp.*, 303 F.3d 571, 581 (5th Cir. 2002)). The Fifth Circuit "has held that such a motion is not the proper vehicle for rehashing evidence, legal theories, or arguments that could have been offered or raised before the entry of judgment." *Id.* at 479 (citing *Simon v. United States*, 891 F.2d 1154, 1159 (5th Cir. 1990)). A motion to alter or amend judgment may be granted on grounds including: (1) an intervening change in controlling law; (2) the availability of new evidence not previously available; or (3) the need to correct clear error or manifest injustice. *See In re Benjamin Moore & Co.*, 318 F.3d 626, 629 (5th Cir. 2002). Although courts have a great deal of

discretion in ruling on a 59(e) motion, it is "an extraordinary remedy that should be used sparingly[.]" *Templet*, 367 F.3d at 479.

## ANALYSIS

*The January 3 Communication*

In its motion, Defendant seeks judgment as a matter of law because,

[t]he sole violation of the Real Estate Settlement Procedures Act ("RESPA") upon which the Court's judgment against Nationstar rests is refuted by the plain language of the statute and undisputed evidence; and [e]ven accepting the jury's finding of a RESPA violation, Plaintiffs failed to present any competent evidence of damages resulting from that single violation.

(Dkt. #89 at p. 1). Defendant maintains that "[t]hese two independent grounds require entry of a take-nothing judgment in favor of Nationstar." (Dkt. #89 at p. 1).

Defendant claims that the January 3 Communication is not a QWR under RESPA because it was faxed and because it was not sent by mail to the QWR office and address that were clearly and properly designated (Dkt. #89 at p. 10). A QWR is defined as,

a written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that — (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower.

12 U.S.C. § 2605(e)(1)(B). A loan servicer must respond to a QWR only if it seeks "information relating to the servicing of [the] loan." 12 U.S.C. § 2605(e)(1)(A). The term "servicing" is defined as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan, including amounts for escrow accounts . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of loan." 12 U.S.C. § 2605(i)(3).

In order to protect consumers, RESPA imposes limited timeframes for loan servicers to respond to inquiries from borrowers. Therefore, "[t]o aid servicers with this task of providing consumers with timely information, RESPA's implementing regulations allow (but do not require) servicers to establish a designated address for QWRs." *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 181 (2d Cir. 2014) (quoting 24 C.F.R. § 3500.21(e)(1) ("By notice either included in the Notice of Transfer or separately delivered by first-class mail, postage prepaid, a servicer may establish a separate and exclusive office and address for the receipt and handling of qualified written requests.")). Where a servicer complies with the notice requirements for designating an exclusive QWR office and address, a letter sent to a different office and address is not considered a QWR under RESPA. *Id.* at 182; *see Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1145 (10th Cir. 2013); *Allen v. Dovenmuehle Mortg., Inc.*, No. 3:13–CV–4710, 2014 WL 3579812, at *8 (N.D. Tex. July 21, 2014); *Steele v. Green Tree Servicing, LLC*, No. 3:09-CV-0603-D, 2010 WL 3565415, at *3 (N.D. Tex. Sept. 7, 2010), *aff'd sub nom. Steele v. Green Tree Servicing, L.L.C.*, 453 F. App'x. 473 (5th Cir. 2011). Stated another way, where the servicer has established a separate and exclusive office and address for the receipt and handling of QWRs, that servicer's duty to respond is triggered only if the borrower sends his or her written request to the designated office and address. *Berneike*, 708 F.3d at 1148-1149; *see Roth*, 756 F.3d at 181 ("[I]f a servicer establishes a designated QWR address, then the borrower must deliver its request to that office in order for the inquiry to be a 'qualified written request.'") (citation omitted).

Defendant argues that the January 3 Communication is not a QWR because it was faxed and not sent by mail (Dkt. #89 at p. 5). Defendant argues that faxing a letter to a servicer that has properly designated a QWR office and mailing address does not trigger the servicer's RESPA duties, even if the servicer actually received the fax. *Berneike*, 708 F.3d. at 1147; *see*

*also Bally v. Homeside Lending, Inc.*, No. 02 C 5799, 2005 WL 2250856, at *2-3 (N.D. Ill. Sept. 8, 2005) (holding that lender's RESPA duty to respond was not triggered by letters faxed to its office, even if lender actually received the letters, where lender had stated that qualified written requests must be sent by mail to a specific address). Defendant points out that its mortgage statement does not provide a fax number for the receipt of QWRs (Dkt. #89 at p. 6). Therefore, Defendant argues that the January 3 Communication does not qualify as a QWR and does not trigger Defendant's duties under RESPA.

Plaintiffs point out that "[Plaintiffs] mailed another copy of the [January 3 Communication] to Nationstar's 'exclusive address' via certified mail on January [18], 2014 in compliance with RESPA." (Dkt. #91 at p. 4). A copy of the certified mail envelope that is dated January 18, 2014 (the "January 18 Envelope"), was admitted into evidence (Dkt. #91 at p. 4; Plaintiffs' Ex. 16). Defendant responds that there is not sufficient evidence to support a jury finding that the January 3 Communication was enclosed in the January 18 Envelope (Dkt. #94 at p. 4-5).

Defendant relies solely on testimony from Fendia's examination in support of its contention that "the record is less than clear that the [January 3 Communication] was in fact included in [the January 18 Envelope]." (Dkt. #94 at p. 4).[2] However, Defendant fails to note that the exhibits themselves support a finding that the January 3 Communication was enclosed in the January 18 Envelope (Plaintiffs' Exs. 14-16). Indeed, the communication that was sent on January 17, 2014 (the "January 17 Communication") states that the original was being sent via certified mail, includes a complete copy of the January 3 Communication, and includes the copy of the January 3 Communication in its 'total number of pages' count that was on the January 17

---

[2] Fendia stated during her testimony that she sent "a letter" on January 3, 2014, and on January 17, 2014 (Trial Tr. 9/10/15 at 85:25-86:11).

Communication's cover sheet (Plaintiffs' Ex. 15). Additionally, Fendia testified that "Plaintiffs' Exhibit 15 . . . was sent by fax, but also sent by . . . Certified Mail[.]" (Trial Tr. 9/10/2015 at 120:16-19). When viewing the evidence in favor of the nonmovant, the Court finds that there was sufficient evidence presented at trial to uphold a jury's finding that the January 3 Communication was included in the January 18 Envelope, and thus it is not disqualified from being considered a QWR, because it was sent by proper means.

Defendant argues that even if the January 3 Communication was included with the January 17 Communication and was sent via certified mail, "the jury expressly found that the [January 17 Communication] was not a QWR." (Dkt. #94 at p. 4). However, it is important to note that the January 17 Communication was considered separately and distinctly from the January 3 Communication. Therefore, it is likely that the jury found that the January 17 Communication was repetitive of the January 3 Communication and therefore only the January 3 Communication constituted a QWR. Although the evidence could support a finding that the January 3 Communication was sent with the January 17 Communication, that does not mean, and Defendant does not argue, that it was improper for the jury to consider the two communications enclosed in the certified envelope as separate communications.[3]

Defendant also argues that the January 3 Communication is not a QWR because it was addressed and sent to an individual instead of being addressed and sent to "Attn: Customer Relations Officer" (Dkt. #89 at p. 6). The January 3 Communication was addressed to and faxed to "Michael Ferrera" (Dkt. #89 at p. 6). Defendant asserts that even accepting Plaintiffs'

---

[3] Defendant comments in its reply that "Plaintiffs cite no authority for the proposition that, when a communication initially fails to meet the statutory requirements of a QWR, it can be revived if it is attached to a subsequent communication that is a valid QWR. Fortunately, the Court need not decide that issue . . ." (Dkt. #94 at p. 2). However, Defendant misconstrues the issue. The issue is not whether one communication can "revive" another, but whether two separate communications can be considered individually although they are sent within the same envelope. Defendant cites no case law establishing that just because a later communication that is repetitive of an earlier communication is included in the same envelope as the earlier communication, the earlier commination is no longer able to be considered a QWR.

testimony that they were informed to communicate with Michael Ferrera, it is undisputed that Defendant never indicated that it would receive QWRs at any office or address other than those designated on the mortgage statements (Dkt. #89 at p. 6).

Defendant argues that the current case is similar to *Steele*. 2010 WL 3565415. In *Steele*, "subsequent correspondence sent to the borrowers indicated they could contact the servicer or its attorneys at other addresses, but the servicer never indicated that it would receive QWRs at any other address." (Dkt. #89 at p. 6) (citing *Steele*, 2010 WL 3565415 at *3). The *Steele* court held that the "other addresses and telephone numbers" were merely "informal avenues to obtain other information." *Steele*, 2010 WL 3565415 at *3. Therefore, they did not alter the "exclusive location at which it would accept" QWRs. *Id.* Thus, the letters that the borrowers sent "were not sent to the exclusive address" that the servicer provided, and the servicer "had no duty under RESPA to respond." *Id.* However, *Steele* involved a very different set of facts than those found in the current case.[4]

---

[4] Defendant cited a number of other cases to support its contention that the January 3 Communication does not legally qualify as a QWR because it did not include "Attention Customer Relations Office" in the address and office. However, the Court found that all of the cases that Defendant cited were unpersuasive because none of them involved a discussion of whether the plaintiff sent the communication to a different office within the same physical address specified to receive QWRs, or a situation where the plaintiff was specifically told to direct their communications to a specific individual within the same physical address that was specified to receive QWRs. *See Berneike v. CitiMortgage, Inc.*, 708 F.3d 1141, 1145-1147 (10th Cir. 2013) (stating that the plaintiff admitted that she did not mail her correspondence to the designated address and the plaintiff instead argued that the defendant waived this requirement); *Allen v. Dovenmuehle Mortg., Inc.*, No. 3:13–CV–4710, 2014 WL 3579812, at *8 (N.D. Tex. July 21, 2014) (finding insufficient pleadings where the plaintiffs only alleged generally that they sent a QWR and did not allege facts involving whether the request was written, sent to a designated address, or requesting information that the defendant was required to provide under RESPA); *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 181 (2d Cir. 2014) (finding that the plaintiff did not send the correspondences to the QWR designated address but to completely different states); *Stein v. Nat'l City Bank*, Civ. No. 09–1995 (MJD/JJG), 2010 WL 5559528, at *4-5 (D. Minn. Nov. 22, 2010) (finding that the plaintiff mailed the letters to the wrong addresses, one of which was the defendant's attorney's office); *Daddabbo v. Countrywide Home Loans*, No. C09–1417RAJ, 2010 WL 4262027, at *2 (W.D. Wash. Oct. 27, 2010) (finding that "Counsel sent that letter to a different address than the one disclosed in the . . . notice"); *Lemieux v. Litton Loan Serv.*, No. 2:09-cv-02816-JAM-EFB, 2009 WL 5206641, at *3 (E.D. Cal. Dec. 22, 2009) (finding the plaintiff's pleadings insufficient because they did not plead facts showing that they mailed a QWR to the address designated by the defendant); *Bally v. Homeside Lending*, No. 02 C 57992005, WL 2250856, at *2-3 (N.D. Ill. Sept. 8, 2005) (finding that the plaintiff's communications did not constitute a QWR where they faxed a copy of the letter and mailed the letter to the defendant's attorney's office instead of mailing it to the physical address specified).

In *Steele*, the alternative means of communication were a phone number and a different physical address that the lender indicated the borrowers "could" use to contact the lender or the lender's attorneys. *Steele*, 2010 WL 3565415 at *3. In the current case, Plaintiffs maintain that before they sent the January 3 Communication, Defendant notified Plaintiffs that Michael Ferrera was now "the single point of contact for this loan" (Trial Tr. 9/9/2015 at 66:19-67:3; Trial Tr. 9/10/2015 at 71:12-18). Additionally, in *Steele*, the plaintiffs sent their inquiries to a different physical address than the one specified for receiving QWRs. *Steele*, 2010 WL 3565415 at *3. In this case, although Plaintiffs' communications were addressed to individuals instead of the "Customer Relations Officer," the physical address was correct.

Furthermore, it certainly would have been reasonable for the jury to find that the January 3 Communication was a QWR given its similarity to the December 16 Communication, which Defendant's corporate representative repeatedly said was a QWR. *See* Trial Tr. 9/10/15 at 15:18-23 (stating that the December 16 Communication was "treated" as a QWR); Trial Tr. 9/10/15 at 47:12-16 (testifying that the December 16 Communication "from the attorney fit into the QWR"); Trial Tr. 9/10/15 at 59:1-4 (referring to the December 16 Communication and then saying that "one letter was QWR"). Both the December 16 Communication and the January 3 Communication were sent to the same physical address, via fax and certified mail, and both were sent to an individual (Plaintiffs' Exs. 12-14, 16). Although Janati stated repeatedly that Defendant's procedures required the letters to include "Attention Customer Relation Officer," she also repeatedly stated that Plaintiffs' December 16 Communication was treated as a QWR (Trial Tr. 9/10/2015 at 15:22-23, 48:12, 48:17-18). In fact, Janati even stated that the December 16 Communication went "to the Customer Relation Officer" (Trial Tr. 9/10/2105 at 47:12-15). Weighing the evidence in favor of the nonmovant, there is certainly enough evidence to support

the jury's determination that the January 3 Communication was addressed with a sufficient level of particularity to meet the requirements of being sent to the proper address and office.[5]

Defendant also argues that the January 3 Communication was not a QWR because the January 3 Communication sought information previously provided and was overbroad (Dkt. #89 at p. 7). Defendant quotes the following requests within the January 3 Communication in support of its argument:

> [a] full and detailed accounting of all payments made to you and Bank of America from the beginning of the loan to the present date . . . a full and complete accounting of the escrow account for this loan from its inception to the present . . . copies of all notice letters, including without limitation, notice of your intent to pay property taxes[.]

(Dkt. #89 at pp. 14-15; Plaintiffs' Ex. 14).

Defendant argues that it was not required to respond to the January 3 Communication because, "RESPA does not require a loan servicer to respond to a borrower's numerous, subsequent requests if the subsequent letters raise essentially the same dispute described in borrower's initial letter and servicer has already adequately responded." (Dkt. #89 at p. 14). Defendant asserts that the January 3 Communication was essentially raising the same dispute described in the December 16 Communication and that the January 3 Communication was merely following up to Defendant's December 24, 2013 response (Dkt. #89 at p. 8). Defendant argues that "Plaintiffs' disagreement or dissatisfaction with [Defendant's] December 24, 2013

---

[5] The December 16 Communication was addressed to "Alex Beaty Dedicated Loan Specialist Nationstar Mortgage, LLC 350 Highland Drive Lewisville, TX 75067-4177" (Plaintiffs' Ex. 12). The January 3 Communication was sent to "Michael Ferrera Nationstar Mortgage Highland Drive Lewisville, TX 75067" (Plaintiffs' Ex. 14). When asked about why he sent the December 16 Communication to Alex Beaty, Kasmir testified that "every time we called it seemed like we got transferred to another person or said somebody else would handle this." (Trial Tr. 9/9/15 at 54:11-14). Kasmir went on to state that he "was able to get somebody on the phone at some point who said you need to send a letter to Alex Beaty. Alex Beaty also may have been the person who wrote the demand letter we got. I don't remember exactly. But I know that his name was presented as the person to send this to who was in charge of our account at this point." (Trial Tr. 9/9/15 at 54:15-21). This testimony is similar to the statements Kasmir made when he was asked about why he later sent the January 3 Communication to Michael Ferrera. Kasmir stated that he had been told that Ferrera was the single point of contact for their loan (Trial Tr. 9/9/15 at 66:19-67:9). Based on Defendant's own corporate representative's testimony and the similarity of these two communications, Defendant is seeking to make a distinction without a difference.

16

response does not constitute a new QWR in and of itself." (Dkt. #89 at pp. 8-9). Furthermore, Defendant claims that "[b]ecause the jury found that [Defendant] adequately responded to the [December 16 Communication], and the [January 3 Communication] was merely a repetitious follow-up letter raising the same dispute, [Defendant] was not required under RESPA to respond as a matter of law." (Dkt. #89 at p. 9).

Plaintiffs argue that the January 3 Communication, "clearly raises new issues, requests additional information, and seeks clarification of the previous response provided by [Defendant]." (Dkt. #91 at p. 5). Specifically, Plaintiffs contend that the letter lists "eleven different, separate, and new issues" (Dkt. #91 at p. 5). The January 3 Communication clearly contains new inquiries about specific payments that were made, specific late payments charges, numbers not adding up to reflect payment totals, and other new inquiries. (Plaintiffs' Ex. 14). This looks vastly different from the December 16 Communication, which generally asked for a full accounting of the "charges to and payments against the referenced loan" (Plaintiffs' Ex. 12). The evidence presented at trial establishes that the information sought in the January 3 Communication was not previously provided and it was not repetitious.

Defendant argues that the January 3 Communication was not a QWR because it was "overbroad and unduly burdensome" (Dkt. #89 at p. 7). Defendant cites two cases in support of this argument. Defendant relies on *Ekundayo v. PNC Bank, National Ass'n*, which stated that an eleven-page letter that contained "discovery-style document demands and interrogatories" was not a QWR. A-14-CA-142-SS, 2014 WL 5092625, at *5 (W.D. Tex. Oct. 9, 2014). Defendant also cites *Ovsepyan v. OneWest Bank, FSB*, which held that an eleven-page-long letter which demanded a laundry list of information, including information about the defendant's business practices and systems of record-keeping, was not a QWR. No. CV 11-8714, 2012 WL

10423213, *2 (C.D. Cal. June 14, 2012). However, the January 3 Communication only contained eleven short questions and it was only three pages long. Additionally, the January 3 Communication is much less broad than the December 16 Communication, which Janati repeatedly stated was a QWR (Plaintiffs' Exs. 12-13). The evidence introduced at trial supported the jury's finding that the January 3 Communication was not overbroad and unduly burdensome.[6] The jury's finding that the January 3 Communication was a valid QWR was reasonable.

*Damages*

Pecuniary Loss

RESPA provides that servicers who fail to comply with the provisions of the statute shall be liable to borrowers for any actual damages incurred by borrowers as a result of such failure. 12 U.S.C. § 2605(f)(1)(A). The burden is on the borrower to prove that he or she incurred actual damages in order to substantiate a RESPA claim. *See Caballero v. Wells Fargo Bank, N.A.*, No. 3-11-CV-1385-O-BD, 2011 WL 6039953, at *2 (N.D. Tex. July 25, 2011); *In re Tomasevic*, 273 B.R. 682, 687 (Bankr. M.D. Fla. 2002); *Ricotta v. Ocwen Loan Servicing, LLC*, No. 06–cv–01502, 2008 WL 516674, at *5 (D. Colo. Feb. 22, 2008).

Defendant argues that there is no legally or factually sufficient evidence that Plaintiffs suffered any damages as a result of Defendant's alleged failure to adequately respond to the January 3 Communication (Dkt. #89 at p. 9). Defendant argues that the jury's finding of $23,500 in pecuniary loss should be set aside because there is no evidence to support such a finding, because the only evidence supporting Plaintiffs' claim of pecuniary loss was speculative, and

---

[6] Additionally, Defendant points out that nothing in the January 3 Communication mentioned RESPA or indicated the letter was intended to be a QWR under RESPA (Dkt. #89 at p. 6). However, RESPA does not require that for a communication to be a QWR, it mention RESPA or indicate that it is intended to be a QWR. *See* 12 U.S.C. § 2605(e)(1)(B).

therefore legally insufficient to support a RESPA claim (Dkt. #89 at pp. 9-10). Defendant cites *McLean v. GMAC Mortgage Corp.*, in support of this contention. 595 F. Supp. 2d 1360 (S.D. Fla. 2009), *aff'd*, 398 F. App'x 467 (11th Cir. 2010).

However, *McLean* involved a very different set of facts. In *McLean*, the court found that damages arising from the mortgagor's unfulfilled professional opportunities, which allegedly resulted from time spent prosecuting RESPA claim violations, were speculative. *Id.* at 1370. However, the mortgagor in *McLean* had not been working for several years due to an injury. *Id.* The damages that Plaintiffs seek in the current case are much less speculative than the damages at issue in *McLean*. *See* Trial Tr. 9/9/15 at 85:24-90:14 (Kasmir stating that they met with a real estate agent who told them that they could lease the property for $4,500-$5,500 per month in fall of 2014); Trial Tr. 9/9/15 at 115:2-116:3 (Geoffrion remarking that Plaintiffs knew an individual who wanted to lease the house, but were advised that they could not rent the house while there was a cloud on the title, were concerned about liability if they were to rent, and believed that renting would be morally wrong); Trial Tr. 9/9/15 at 94:13-95:2 (Kasmir testifying that Plaintiffs still owned the house, that they had lived there for four months last year, and that they had lived in the house for a few months the previous year).

Given the facts stated above, it would have been reasonable for the jury to find that Plaintiffs would have received rental income for up to eight months of the last year. Renting the house for eight months would have resulted in rental income of $36,000-$44,000 if the range that the real estate agent told Plaintiffs was reasonable was accurate. The evidence presented during trial was sufficient to support an award of $23,500 for pecuniary loss.

<u>Mental Anguish</u>

*Recoverable Under RESPA*

Defendant argues that the jury's award of $151,500 in mental anguish should be set aside because mental anguish damages are not recoverable under RESPA (Dkt. #89 at pp. 10-11). The Fifth Circuit and the Supreme Court have not yet addressed whether mental anguish damages are recoverable under RESPA.

Of the circuits that have addressed the issue, two have indicated that emotional distress damages should be allowed, while no circuit appears to have ruled that emotional damages are not allowed. *See Houston v. U.S. Bank Home Mortg. Wisconsin Servicing*, 505 F. App'x. 543, 548, 548 n.6 (6th Cir. 2012) (remanding case for further fact-finding about alleged emotional damages arising from servicer's failure to respond to QWR and holding that "[w]e find nothing in the text of § 2605(f), or in RESPA more broadly, to preclude 'actual damages' from including emotional damages, provided that they are adequately proven"); *Catalan v. GMAC Mortg. Corp.*, 629 F.3d 676, 696 (7th Cir. 2011) (acknowledging that the defendant conceded that RESPA allowed for recovery of emotional distress damages). Additionally, the Eleventh Circuit explained that a plaintiff alleging a RESPA violation "arguably may recover for non-pecuniary damages, such as emotional distress and pain and suffering . . ." *McLean v. GMAC Mortg. Corp.*, 398 F. App'x. 467, 471 (11th Cir. 2010) (rejecting emotional distress damages in RESPA claim because plaintiffs failed to adequately demonstrate causation).

The two district courts within the Fifth Circuit that have addressed this issue have concluded that mental anguish damages are not permitted under RESPA (Dkt. #89 at p. 11). *See Steele v. Quantum Servicing Corp.*, No. 3:12-CV-2897-L, 2013 WL 3196544, at *7-8 (N.D. Tex. June 25, 2013); *Trahan v. GMAC Mortg. Corp.,* No. EP–05–CA–0017–FM, 2006 WL 5249733,

at *8 (W.D. Tex. July 21, 2006) ("The statute does not permit mental anguish damages and this court is not at liberty to award damages which are not provided for in the statute.").  But other district courts have allowed for the recovery of mental anguish damages for a RESPA claim.  *See Rawlings v. Dovenmuehle Mortg., Inc.,* 64 F. Supp.2d 1156, 1166–67 (M.D. Ala. 1999) (citing cases that have held that nonpecuniary damages for emotional distress are available under RESPA); *but see Katz v. Dime Sav. Bank, FSB,* 992 F. Supp. 250, 255–56 (W.D.N.Y. 1997) (concluding that nonpecuniary damages are not available under RESPA).

All of the cases that have allowed for the recovery of mental anguish damages for a RESPA claim have turned on whether or not RESPA is a remedial consumer-protection statute. This is because courts construe remedial consumer-protection statutes "liberally in order to best serve Congress' intent." *Rawlings v. Dovenmuehle Mortgage, Inc.*, 64 F. Supp. 2d 1156, 1165 (M.D. Ala. 1999) (citing *Ellis v. General Motors Acceptance Corp.*, 160 F.3d 703, 707 (11th Cir. 1998)).  Therefore, the Court must determine if RESPA is a remedial consumer-protection statute.

The first step for the Court in construing a statute is to interpret the statutory language. Section 2605 of RESPA provides for the recovery of "any actual damages to the borrower" as a result of a servicer's failure to comply with said section. 12 U.S.C. § 2605(f)(1)(A).  "A basic canon of statutory construction is that words should be interpreted as taking their ordinary and plain meaning." *United States v. Yeatts*, 639 F.2d 1186, 1189 (5th Cir. 1981) (citing *Perrin v. United States*, 444 U.S. 37, 42 (1980)).  We must assume that Congress used the words of the statute as they are commonly and ordinarily understood.  *Id.*  Section 2605 of RESPA provides for the recovery of "any actual damages to the borrower" as a result of a servicer's failure to comply with said section.  12 U.S.C. § 2605(f)(1)(A).  "The term 'actual damages,' however,

'has no consistent legal interpretation' because 'the interpretation var[ies] with the context of use.'" *Rawlings*, 64 F. Supp. 2d at 1165 (quoting *Fitzpatrick v. Internal Revenue Serv.*, 665 F.2d 327, 329 (11th Cir. 1982)). Therefore, "[b]ecause 'actual damages' has no 'plain meaning' in legal lexicon," the court "attempt[s] to discern Congressional intent on this issue." *Id.*

First, the Court finds that the statutory language of RESPA demonstrates Congress' intent that RESPA be a remedial consumer-protection statute. Indeed, RESPA states its purpose clearly when it says,

> Congress finds that significant reforms in the real estate settlement process are needed to insure that *consumers throughout the Nation* are provided with greater and more timely information on the nature and costs of the settlement process and *are protected* from unnecessarily high settlement charges caused by certain abusive practices that have developed in some areas of the country.

12 U.S.C. § 2601(a) (emphasis added). Additionally, the Court agrees with the analysis in *Rawlings* that found that RESPA's legislative history demonstrates that it was designed to be remedial in nature, and that it was intended to protect consumers. 64 F. Supp. 2d at 1164-67.

The Court also agrees with the line of cases that has determined that RESPA is a remedial consumer-protection statute. *See Medrano v. Flagstar Bank, FSB*, 704 F.3d 661, 665-666 (9th Cir. 2012) (finding that "Congress intended RESPA to serve consumer-protection purposes" and stating that the statute has a remedial purpose); *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111 (2d Cir. 2007) (stating that "RESPA's overall goal [is] to protect consumers from abusive practices that result in unnecessarily high settlement charges.") (citation omitted); *Hardy v. Regions Mortgage, Inc.*, 449 F.3d 1357, 1359 (11th Cir. 2006) (finding that "RESPA is a consumer protection statute that regulates the real estate settlement process"); *Carter v. Countrywide Home Loans, Inc.*, No. CIV. 3:07-CV651, 2009 WL 1010851, at *4 (E.D. Va. Apr. 14, 2009) (stating that "the statutory language is clear that Congress intended for RESPA to be a

remedial consumer protection statute"); *Wienert v. GMAC Mortgage Corp.*, No. 08-CV-14482, 2009 WL 3190420, at *10-11 (E.D. Mich. Sept. 29, 2009) (citing cases that found that RESPA was a remedial consumer-protection statute and concluding that "recovery for emotional distress damages is available under § 2605(f) of RESPA"); *Ploog v. HomeSide Lending, Inc.*, 209 F. Supp. 2d 863, 870 (N.D. Ill. 2002) (holding that "RESPA is a consumer protection statute and RESPA's actual damages provision includes recovery for emotional distress"); *Johnstone v. Bank of Am., N.A.*, 173 F. Supp. 2d 809, 816 (N.D. Ill. 2001) (finding that the express terms of RESPA clearly indicate that it is, in fact, a consumer protection statute); *Rawlings v. Dovenmuehle Mortgage, Inc.*, 64 F. Supp. 2d 1156, 1164-67 (M.D. Ala. 1999) (finding that the statutory language clearly demonstrates Congress' intention that RESPA be a remedial consumer-protection statute).

In reaching this conclusion, the Court is also persuaded by Fifth Circuit cases addressing other consumer-protection statutes that are remedial in nature, wherein the Fifth Circuit has found "actual damages" provisions to include damages for mental anguish. *See, e.g., Stevenson v. TRW, Inc.,* 987 F.2d 288, 296 (5th Cir. 1993) (stating that the Fair Credit Reporting Act ("FCRA") "authorizes a consumer to recover actual damages, which include humiliation or mental distress, even if the consumer has suffered no out-of-pocket losses"); *Fischl v. General Motors Acceptance Corp.*, 708 F.2d 143, 148 (5th Cir. 1983) (holding that actual damages include mental anguish under the Equal Credit Opportunity Act, 15 U.S.C. § 1691(e)). Therefore, the Court finds that RESPA is a remedial consumer-protection statute, and because statutes must be construed liberally in this context, the Court finds that mental anguish damages are included within RESPA's actual damages provision.

*Sufficiency of the Evidence*

Defendant also argues that Plaintiffs failed to present any legally or factually sufficient evidence of any mental anguish damages caused by Defendant's failure to respond to the January 3 Communication (Dkt. #89 at pp. 12–13).[7]  A plaintiff must present "direct evidence of the nature, duration, or severity of their mental anguish, thus establishing a substantial disruption in the plaintiffs' daily routine," or evidence of "a high degree of mental pain and distress" that is "more than mere worry, anxiety, vexation, embarrassment, or anger." *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996) (quoting *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995)); *see also Bentley v. Benton*, 94 S.W.3d 561, 606 (Tex. 2002).  At trial, legally sufficient evidence was introduced to support an award of mental anguish damages. *See* Trial Tr. 9/9/15 91:16-94:5 (Kasmir stating that he missed work, experienced nausea and sleeplessness); Trial Tr. 9/9/15 120:1-25 (Geoffrion stating that she experienced nausea and headaches and mentioning a particular time where she was unable to celebrate her niece's life due to having to involve herself with this dispute).

Defendant contends that "Plaintiffs failed to establish any causal link between their claimed mental anguish and the only misconduct found by the jury — Nationstar's failure to respond to the [January 3 Communication]" (Dkt. #89 at pp. 13–14).  Defendant states that because most, if not all, of the anguish Plaintiffs felt was caused by the illness of their niece, there was no basis for awarding $151,000 in mental anguish damages against Defendant (Dkt. #89 at p. 13).

---

[7] Defendant also alleges that since there was no mention of "mental anguish damages" in Plaintiffs' complaint, during discovery, or in the parties' Joint Pretrial Order, Plaintiffs waived any type of mental anguish award (Dkt. #89 at p. 12).  However, as discussed above, mental anguish damages are included in actual damages under RESPA, which Plaintiffs included in their Complaint (Dkt. #7 at ¶ 26).  Additionally, Defendant did not assert this argument in its initial Motion for Judgment as a Matter of Law (Trial Tr. 9/10/15 at 92:6-94:10).  Therefore, Defendant cannot argue waiver on these grounds for the first time now.

Defendant relies upon *Gunn Infiniti, Inc. v. O'Byrne*, a case that reversed an award of mental anguish damages because "[m]any of the feelings [the plaintiff] described were unrelated to [the defendant's] DTPA violations." 996 S.W.2d 854, 860-61 (Tex. 1999). However, the current case is distinguishable. In *Gunn Infiniti, Inc.*, there was limited testimony about mental anguish, and the testimony that the court relied upon demonstrated that the source of the anguish came from the plaintiff's choice of brand, not from the DTPA violation. *Id.* Conversely, in this case, there was a considerable amount of testimony about how Defendant's failure to properly respond to Plaintiffs' inquiries was the source of their distress (Trial Tr. 9/9/15 at 90:19-94:5, 118:20-120:8). At trial, there was sufficient evidence of mental anguish to support the jury's award of damages.[8]

Defendant goes on to argue that, "[t]o the extent that Plaintiffs attempted to connect their alleged mental anguish to their frustration with [Defendant] generally, this presents a problem because all but one of Plaintiffs' RESPA claims was rejected by the jury." (Dkt. #89 at p. 14). Defendant maintains that since Plaintiffs did not offer an "evidentiary basis for differentiating or segregating between" the mental anguish caused by their niece's illness, the anguish caused by Defendant's failure to respond to the letters that were not QWRs, and the anguish specifically caused by Defendant's failure to respond to the January 3 Communication, they should not be able to receive mental anguish damages (Dkt. #89 at p. 14).

---

[8] Similarly, Defendant also suggests that because there was no expert testimony or health record evidence presented regarding the mental anguish suffered by Plaintiffs, they are not able to recover mental anguish damages (Dkt. #89 at pp. 18-19). The actual damages portion of RESPA can be interpreted in a manner similar to the FDCPA. *McLean*, 595 F. Supp. 2d at 1370. Therefore, the Court finds that Plaintiffs may establish emotional damages under RESPA through their own, lay testimony. *Guajardo v. GC Servs.*, LP, 498 F. App'x 379, 385 (5th Cir. 2012) (finding sufficient evidence to support the award of mental anguish under the FDCPA even where jury heard contradictory proof from the plaintiff herself).

However, Kasmir specifically differentiated between the stress he experienced from his niece's illness and eventual death and the stress that he experienced as a result of Defendant's failure to answer their QWR. During trial, Kasmir stated,

> Obviously we've had our own stresses to deal with outside of Nationstar that coincide with this, but the idea that we can't get something which should be very clear -- I mean, there are numbers. This is something that could be represented on a spreadsheet. And the fact that it has taken all of this, and even now we don't know. I couldn't tell you exactly where we are or what they say we owe or how to substantiate any of that. It's draining emotionally.

(Trial Tr. 9/9/15 at 92:24-93:7). Likewise, Geoffrion also differentiated the emotional distress she experienced from the illness and death of her niece from the stress that was caused by Defendant's failure to respond to Plaintiffs' request for information.[9] *See* Trial Tr. 9/9/15 at 119:1-3 (agreeing that she was able to compartmentalize the two "stressers" and explaining that they are "completely different").

It is true that Plaintiffs are not permitted to recover for mental anguish allegedly caused by claims for which they did not recover at trial. *See City of Dall. v. Rodriguez*, No. 05-97-00280-CV, 1999 WL 689615, at *9 (Tex. App.—Dallas Sept. 7, 1999, no pet.) (denying recovery for mental anguish damages specifically attributed to a claim for which the plaintiff did not recover at trial). However, causation is an inherently fact-sensitive issue. *See, e.g., Millhouse v. Wiesenthal*, 775 S.W.2d 626, 627 n.2 (Tex. 1989) (holding determination of causation is a question of fact for the jury); *Farley v. MM Cattle Co.*, 529 S.W.2d 751, 756 (Tex. 1975); *see Lynch v. Ricketts*, 314 S.W.2d 273, 276 (Tex. 1958) (describing causation as an "ultimate fact issue"). Additionally, the jury was instructed that they could only award

---

[9] Defendant suggests that because Geoffrion was not the individual calling, faxing, and mailing communications to Defendant, it could not have caused Geoffrion any type of mental anguish (Dkt. #89 at p. 13). However, case law is clear that an attorney may send a QWR on behalf of their client and the Court sees no reason why this should bar an injured plaintiff from receiving mental anguish damages. *See Roth*, 756 F.3d at 181 (considering whether letters that the plaintiff's lawyer sent were QWRs and not discussing the fact that they were sent by a lawyer instead of the plaintiff herself); *Daddabbo*, 2010 WL 4262027, at *2 (finding that the letters that the plaintiff's lawyer sent were not QWRs because they were sent to the wrong address, not because they were sent by a lawyer).

compensatory damages for injuries that "Plaintiffs prove were proximately caused by Nationstar's allegedly wrongful conduct." (Dkt. #74 at p. 8).[10] The evidence presented at trial, in conjunction with the instructions given to the jury, are more than sufficient to uphold the jury's verdict as it relates to the inherently fact-intensive issue of causation.

Statutory Damages

Defendant also argues that Plaintiffs are not entitled to statutory damages because there is no legally or factually sufficient evidence that Defendant engaged in a pattern or practice of noncompliance with the requirements of RESPA (Dkt. #89 at p. 14). RESPA permits an award of up to $2,000 "in the case of a pattern or practice of noncompliance with the requirements of this section." 12 U.S.C. § 2605(f)(1)(B). Although there is no particular number of violations that create a "pattern or practice of noncompliance," federal courts have consistently held that two violations of RESPA are insufficient to support a claim for statutory damages. *See, e.g., Kapsis v. American Home Mortg. Servicing Inc.*, 923 F.Supp.2d 430, 445 (E.D.N.Y. 2013); *McLean*, 595 F. Supp. 2d at 1365-66; *In re Maxwell*, 281 B.R. 101, 123 (Bankr. D. Mass. 2002).

Defendant points out that the jury found that it only violated RESPA on one occasion with regards to Plaintiffs (Dkt. #89 at p. 15). However, Defendant incorrectly argues that "Plaintiffs presented no evidence of any kind showing a standard or institutionalized practice of

---

[10] Defendant also argues that "[t]he damages awarded must fairly and reasonably compensate the loss, and there must be some evidence to support the amount awarded." (Dkt. #89 at p.13 n. 2). Defendant states that Plaintiffs presented no evidence regarding the amount of mental anguish damages (Dkt. #89 at p. 13 n. 2). However, the cases that Defendant cites are distinguishable. In *Saenz*, the appellate court found that there was no evidence that supported an award of $250,000 for mental anguish damages. 925 S.W.2d at 614. Likewise, in *Bentley v. Bunton*, the court found that a $7,000,000 award of mental anguish damages, which was more than forty times the amount awarded for damage to his reputation, was more than excessive and unreasonable. 94 S.W.3d 561, 607 (Tex. 2002). The current case is much less extreme. The amount awarded in the current case is a much smaller award than in the cases that Defendant cites. Furthermore, other courts have upheld much larger awards. *See McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 957 (9th Cir. 2011) (finding that ample evidence exists in the record to support the jury's award of $250,000 for mental anguish for FDCPA violation); *see also Bullock v. Abbott & Ross Credit Servs., L.L.C.*, No. A-09-CV-413 LY, 2009 WL 4598330, at *4 (W.D. Tex. Dec. 3, 2009) (discussing how longer-term emotional distress and physical ailments warrant higher awards of mental anguish damages than other, less serious emotional distress).

noncompliance by Nationstar." (Dkt. #89 at p. 15). Janati testified that there was no written policy at Nationstar for identifying QWRs prior to April 6, 2015 (Trial Tr. 9/10/15 at 8:3-23, 14:11-14). However, Janati also stated that "every department had procedures in place" (Trial Tr. 9/10/15 at 43:24). In view of the conflicting testimony, it is clear that the jury could have found that a pattern or policy existed, and that it was not in compliance with RESPA.[11]

*Kasmir's Standing*

Defendant argues that it is entitled to judgment against Kasmir because he lacks standing to bring a RESPA claim against Defendant because he is not a "borrower" under RESPA (Dkt. #89 at p. 15). Defendant argues that Kasmir is not a borrower because he did not sign the promissory note and thus was not required to make payments on the note (Dkt. #89 at pp. 15-18). Plaintiffs argue that Kasmir is a borrower with standing under RESPA because he signed the Deed of Trust (Dkt. #91 at p. 8). Plaintiffs maintain that the Deed of Trust expressly incorporates RESPA and "expressly extends rights granted by RESPA to the 'Borrowers' named in the Deed of Trust, which includes . . . Kasmir" (Dkt. #91 at p. 8). However, Defendant points out that the Deed of Trust specifically states that "[A]ny Borrower who co-signs this Security Instrument but does not execute the Note . . . is not personally obligated to pay the sums secured by this Security Instrument." (Plaintiffs' Ex. 19 at p. 9). However, Plaintiffs note that RESPA does not define 'borrower' and that Defendant is relying on non-binding case law for its more limited definition of 'borrower' (Dkt. #91 at p. 8). While the Court was unable to locate any judicial authority that found that a party who did not sign the note was a "borrower" under RESPA, it need not decide the issue today.

---

[11] Janati also testified that she was involved in many other lawsuits that were pending and that she was unaware of other specific pending cases with facts similar to the current case (Trial Tr. 9/10/15 at 61:9-63:18).

The Court need not decide the issue, because Defendant failed to raise the issue of Kasmir's standing in its original Rule 50 motion (Dkts. #89 at p. 18, #91 at p. 8). Defendant acknowledges that it is raising Kasmir's lack of standing for the first time and points out that Kasmir was bringing a breach of contract claim until the morning of the trial (Dkt. #89 at p. 18). Defendant argues that standing is a component of subject matter jurisdiction, which cannot be waived (Dkt. #89 at p. 24).

Usually, an issue that is raised for the first time on a motion for new trial or renewed motion for judgment as a matter of law is waived. *See WesternGeco L.L.C. v. ION Geophysical Corp.*, 953 F. Supp. 2d 731, 740 (S.D. Tex. 2013) *aff'd in part, rev'd in part*, 791 F.3d 1340 (Fed. Cir. 2015) (citing *Auster Oil & Gas, Inc. v. Stream*, 835 F.2d 597, 601 (5th Cir. 1988)). However, the Fifth Circuit has made clear that "[a]s standing is not subject to waiver by the parties, . . . [a party's] pretrial, and even post-trial, failures to contest standing cannot, ipso facto, create jurisdiction in federal court." *Doe v. Tangipahoa Par. Sch. Bd.*, 494 F.3d 494, 499 (5th Cir. 2007) (finding that the court lacked subject matter jurisdiction). The Fifth Circuit has also stated that "[i]t is true that subject-matter jurisdiction cannot be created by waiver or consent. It is equally true that federal courts must address jurisdictional questions whenever they are raised and must consider jurisdiction sua sponte if not raised by the parties." *Howery v. Allstate Ins. Co.*, 243 F.3d 912, 919 (5th Cir. 2001).

However, the Fifth Circuit has made an important distinction between "prudential standing" and constitutional standing. In *Ensley v. Cody Resources, Inc.*, the defendant moved for judgment as a matter of law at the close of the plaintiff's case-in-chief, in part, on the grounds that the plaintiff lacked standing to recover individually as a shareholder. 171 F.3d 315, 318 (1999). The jury awarded the plaintiff damages and the court entered judgment for the plaintiff.

*Id.* Then the defendant again moved for judgment as a matter of law on the standing issue. *Id.* This time the court found that the claim belonged to the company and not to the plaintiff individually. *Id.* The court granted the motion and entered an amended take-nothing judgment. *Id.* Then, "[o]n reconsideration, the court held that [the defendant's] objection was not 'standing' in its jurisdictional sense and sua sponte determined that the objection was a real-party-in-interest question that [the defendant] had waived by not raising it before trial." *Id.* The court then entered a second amended judgment awarding the plaintiff damages and postjudgment interest. *Id.*

The case at hand is strikingly similar to *Ensley*. In *Ensley*, the defendant relied on "caselaw holding that a shareholder lacks standing to pursue the corporation's cause of action." *Id.* at 319. In the current case, Defendant relies on case law that states that Kasmir is not a "borrower" under the statute, and thus lacks standing to pursue a cause of action against the Defendant (Dkt. #89 at p. 15). Likewise, in *Ensley*, the defendant neglected to address the distinction between constitutional and "prudential" limitations on standing. *Id.* The *Ensley* court held that cases on shareholders' lack of standing do not address injury in fact, and the real objection, since injury was obvious, was to the real party in interest. *Id.* at 320. Reasoning thus, the court found that the "prudential" standing argument was waived, and affirmed the denial of judgment as a matter of law. *Id.*

The Supreme Court has made clear that Article III's standing requirements are separate and distinct from statutory interpretation considerations which determine whether a "particular class of persons ha[s] a right to sue under this substantive statute." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387 (2014) (quoting *Association of Battery Recyclers, Inc. v. EPA*, 716 F.3d 667, 675–676 (2013)). Likewise, the Fifth Circuit has stated

that, "[a]lthough often clothed as an issue of subject-matter jurisdiction, the Supreme Court has made clear that 'the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e. the court's statutory or constitutional power to adjudicate the case." *Janvey v. Brown*, 767 F.3d 430, 437 (5th Cir. 2014) (quoting *Lexmark Int'l, Inc.*, 134 S. Ct. 1377, 1387 n.4 (2014)); *see also Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*, 786 F.3d 400, 409 (5th Cir. 2015) ("'statutory standing' is a misleading label since the absence of a valid . . . cause of action does not implicate subject-matter jurisdiction") (citing *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642–43(2002) (internal quotations omitted)).  Therefore, Defendant is not making a constitutional argument that Kasmir lacks standing when it argues that Kasmir is not a 'borrower' under the RESPA, but a prudential argument.  *Ensley* held that an objection that implicated prudential standing that was made after a plaintiff's case-in-chief was too late, even when framed as a standing issue, and thus the objection was waived.  171 F.3d at 318.  Therefore, when a defendant fails to object to prudential standing concerns until their *renewed* motion for judgment as a matter of law, the defendant has certainly waived their objection. [12]

---

[12] Plaintiffs also argue that Defendant stipulated to the following facts which negate Defendant's standing argument (Dkt. #91 at p. 9):  "On or around August of 2003, **Plaintiffs** purchased a single-family home located at 934 Dunsmuir Avenue, Los Angeles, CA 90036 (the 'Property')."  (Dkt. #74 at p. 5) (emphasis added).  "After purchasing the Property in 2003, **Plaintiffs** refinanced their mortgage. . ." (Dkt. #74 at p. 5) (emphasis added). "To secure repayment of the Note, **Plaintiffs** executed a deed of trust encumbering the Property.  (The June 30, 2004 note and deed of trust are the 'Loan.')." (Dkt. #74 at p. 5) (emphasis added).  "Nationstar contends **Plaintiffs** are delinquent on their account." (Dkt. #74 at p. 6) (emphasis added).  Defendant does not address this argument. While case law is clear that regardless of whether the parties have stipulated to facts establishing constitutional jurisdiction, "courts are required to examine the true facts."  *In re Olson*, No. 92 A 258, 1995 WL 348038, at *7 (N.D. Ill. May 30, 1995) (citing *Kanzelberger v. Kanzelberger*, 782 F.2d 774 (7th Cir. 1986)).  However, as explained above, this is not a situation in which Defendant is actually making a jurisdictional argument. While the stipulations above only demonstrate further that Defendant waived its objection to Kasmir's ability to bring this claim, the Court need not rely on the stipulations to arrive at the conclusion that Defendant waived its objection.

However, Defendant also appears to suggest that Kasmir lacks Article III standing.[13] "From Article III's limitation of the judicial power to resolving 'Cases' and 'Controversies,' and the separation-of-powers principles underlying that limitation, [the Supreme Court] ha[s] deduced a set of requirements that together make up the 'irreducible constitutional minimum of standing.'" *Id.* at 1386 (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992)). "The plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Id.* As discussed previously in the "Damages" section above, as an owner of the property who was not able to lease the property because of the ongoing dispute, Kasmir has established that he was injured by Defendant's failure to respond to the January 3 Communication. Furthermore, the Defendant's harmful actions are likely to be redressed by a favorable judicial decision, such as a jury's award of damages for those injuries, which has actually already occurred.

Defendant goes on to argue that because the questions in the jury charge were not segregated between the two Plaintiffs, no judgment can be formed as to Geoffrion. Defendant claims that because Plaintiffs had the burden to obtain individual findings on both liability and damages as to each of the Plaintiffs, it is not possible for the Court to enter judgment for Geoffrion (Dkt. #89 at p. 24). Defendant cites *Decorte v. Jordan* in support of its contention that Plaintiffs had the burden to obtain individual findings on both liability and damages as to each of them. 497 F.3d 433, 442 (5th Cir. 2007). However, the Court understands *Decorte* to mean only that in order to receive mental anguish damages, each plaintiff must provide specific

---

[13] Defendant does not directly and specifically address Article III standing, but does cite several cases where courts found that the plaintiffs did not have Article III standing to bring a claim under RESPA because they were not signatories to the note (Dkt. #89 at pp. 15-19). Therefore, the Court will analyze whether Kasmir has Article III standing.

individualized evidence about how they were personally affected.  *Id.*  As described above, Plaintiffs both testified that they experienced physical manifestations of their mental anguish.

Plaintiffs assert that any error in the collective submission of "Plaintiffs" has been waived because there was no objection to the jury charge (Dkt #91 at p. 10) (citing FED. R. CIV. P. 51(d)(1); *Crist v. Dickson Welding, Inc.*, 957 F.2d 1281, 1286 (5th Cir. 1992)).  Defendant contends that it is Plaintiffs' burden to submit a substantially correct jury charge on which they have the burden of proof and that the collective submission of "Plaintiffs" where one plaintiff lacked standing is plain error (Dkt. #94 at pp. 8-9).  Defendant does not explain this argument beyond mentioning the plain error rule and citing *Tompkins v. Cyr.*  202 F.3d 770, 785-86 (5th Cir. 2000).  Defendant contends that *Tompkins* applies to the current case because it holds that double recovery is plain error, which requires reversal (Dkt. #94 at pp. 8-9).  However, as discussed above, Defendant waived its non-constitutional standing defense.  Therefore, there was no double recovery, and the damages awarded were not plain error.

*New Trial*

Alternatively, Defendant seeks a new trial, alleging that there is no factually sufficient evidence to support the jury findings, and the jury's damages are excessive for the reasons discussed above (Dkt. #89 at p. 18).  Defendant also seeks a new trial for the following reasons: (1) jury charge error in submitting "Plaintiffs" collectively; (2) evidentiary error in admitting evidence regarding the illness and death of Plaintiffs' juvenile niece; (3) improper jury argument regarding "eggshell plaintiff" doctrine; and (4) the Court's questioning of Janati (Dkt. #89 at pp. 18-22).

"If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), the court is considered to have submitted the action to the jury subject to the court's later

deciding the legal questions raised by the motion." FED. R. CIV. P. 50(b). Therefore, a movant may file a renewed judgment as a matter of law, which may include an alternative or joint request for a new trial under Rule 59, "[n]o later than 28 days after the entry of judgment." *Id.* "[A] jury verdict must be upheld, and judgment as a matter of law may not be granted, unless 'there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did.'" *Fractus*, 876 F. Supp. 2d at 813 (citing *Hiltgen*, 47 F.3d at 700). The jury's verdict must be supported by "substantial evidence" in support of each element of the claims. *Am. Home Assurance Co.*, 378 F.3d at 487.

"A court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmoving party; however, a court may not make credibility determinations or weigh the evidence, as those are solely functions of the jury." *Fractus*, 876 F. Supp. 2d at 813; *see Reeves*, 530 U.S. at 150-151. "The moving party is entitled to judgment as a matter of law, 'only if the evidence points so strongly and so overwhelmingly in favor of the [] moving party that no reasonable juror could return a contrary verdict.'" *SSL Servs., LLC*, 940 F. Supp. 2d at 486 (quoting *Porter*, 659 F.3d at 445 (alteration in original, citation omitted)).

"The court may, on motion, grant a new trial on all or some of the issues[.]" FED. R. CIV. P. 59(a)(1). "[I]f the trial judge is not satisfied with the verdict of a jury, he has the right—and indeed the duty—to set the verdict aside and order a new trial." *Transworld Drilling Co.*, 773 F.2d at 613 (citation omitted). In ruling on a motion for new trial, the jury's verdict may not be lightly set aside. *See Ellis*, 258 F.3d at 343 ("[C]ourts 'must attempt to reconcile the jury's findings, by exegesis, if necessary, before we are free to disregard the jury's verdict and remand the case for a new trial.'"). "In considering whether the seemingly inconsistent verdicts may be

reconciled, the court must view the evidence in the light most favorable to upholding the jury's decision by a finding of consistency." *Id.*; *see Hiltgen*, 47 F.3d at 701.

<u>Individualized Damages</u>

In the alternative, Defendant seeks a new trial on various grounds. Defendant argues that "Plaintiffs were required to obtain individual, rather than collective, findings for claimed pecuniary loss and mental anguish damages." (Dkt. #89 at p. 19). Defendant asserts that because the jury findings are not separated out between the individual claims, Plaintiffs are not entitled to any recovery as a matter of law (Dkt. #89 at p. 19). However, as discussed above, Defendant did not raise an objection to Kasmir's standing at any point prior to its Renewed Motion for Judgment as a Matter of Law, and thus its objection to his standing was waived.

<u>Admission of Evidence Regarding Ill Niece</u>

Defendant also asserts that the Court committed an evidentiary error by admitting evidence regarding the illness and death of Plaintiffs' juvenile niece (Dkt. #89 at p. 19). Defendant argues that this information was not relevant to Plaintiffs' RESPA claim and that "any remote probative value that Plaintiffs' niece's health condition may have had to the claims in this lawsuit was substantially outweighed by the danger of unfair prejudice, confusing of the issues, and misleading the jury." (Dkt. #89 at p. 19).

Evidence is relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. Fed. R. Evid. 401. The court may exclude relevant evidence only if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. Fed. R. Evid. 403.

The evidence and testimony regarding Plaintiffs' terminally ill niece was relevant to why Plaintiffs left their house in California to be in Texas, where their niece was living (Trial Tr. 9/9/15 at 24:5-28:21). This was also relevant because it helped explain why it took time for Plaintiffs to become aware of the fact that they were in default (Trial Tr. 9/9/15 at 102:13-21). Additionally, this evidence is relevant to why Plaintiffs were interested in renting out the house instead of selling it (Trial Tr. 9/9/15 at 86:3-90:11).

District courts are granted broad discretion in admitting evidence, and their rulings are reviewed only for an abuse of discretion. *Perez v. Texas Dep't of Criminal Justice, Institutional Div.*, 395 F.3d 206, 210 (5th Cir. 2004) (citing *Kelly v. Boeing Petroleum Servs.*, 61 F.3d 350, 356 (5th Cir. 1995)). Furthermore, "[a]n erroneous evidentiary ruling is reversible error only if the ruling affects a party's substantial rights. *Id.* (citing *Kelly*, 61 F.3d at 361). Even assuming the Court made an erroneous evidentiary ruling on this issue, which it did not, this testimony and evidence did not affect Defendant's substantial rights. *See EEOC v. Manville Sales Corp.*, 27 F.3d 1089, 1093 (5th Cir. 1994) (finding that employer's remarks over four-year period were relevant to age discrimination case and were improperly excluded).

Improper Jury Argument

Defendant also argues that there was improper jury argument regarding the "eggshell plaintiff" doctrine (Dkt. #89 at p. 20). Defendant argues that the tort doctrine of the "eggshell plaintiff" has no relevance to this statutory RESPA case and that the improper invocation of the doctrine was prejudicial in that it unduly aroused the sympathy of the jury and thereby influenced its verdict (Dkt. #89 at p. 20). Defendant asserts that the effect of this improper argument was plain error (Dkt. #89 at p. 20).

A motion for a new trial premised on improper arguments by counsel "should only be granted when improper closing argument irreparably prejudices a jury verdict." *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 509 (5th Cir. 2012) (citation omitted). "To justify a reversal based on improper comments of counsel, the conduct must be such as to gravely impair the calm and dispassionate consideration of the case by the jury." *Dixon v. Int'l Harvester Co.*, 754 F.2d 573, 585 (5th Cir. 1985) (citation omitted). Therefore, closing argument must go far beyond the bounds of accepted advocacy before a court must grant a new trial. *Edwards v. Sears, Roebuck & Co.*, 512 F.2d 276, 284 (5th Cir. 1975). Here, the closing argument was well within the bounds of proper argument.[14] Even assuming the argument was improper, Defendant failed to object and obtain a ruling during trial, and has thus waived its objection to these statements. *Baisden*, 693 F.3d at 509.

The Court's Questioning of Janati

Defendant also asserts that the Court's questioning of Janati expressed disbelief and "thereby trespassed on the jury's function of assessing the credibility of the witness" (Dkt. #89 at p. 27).

The first issue regarding Janati arose on May 15, 2015, when Plaintiffs filed their Motion for Sanctions (Dkt. #30). In the Motion for Sanctions, Plaintiffs asked that the Court compel Defendant to produce a competent corporate representative, award Plaintiffs' counsel's travel costs, and award Plaintiffs' attorneys' fees for preparing and attending the deposition (Dkt. #30). Plaintiffs asserted that "Janati was evasive during her deposition, and responded with 'I don't

---

[14] At least one other court has utilized similar information in its determination of whether a plaintiff was more prone to suffer higher degrees of mental anguish than others similarly situated. *See McCollough v. Johnson, Rodenburg & Lauinger, LLC*, 637 F.3d 939, 957 (9th Cir. 2011) (holding that $250,000 award for emotional damages under the FDCPA and MCPA was proper and discussing a doctor's testimony that the lawsuit may have worsened a head injury victim's existing mental anguish symptoms).

know' to virtually every single important question relating to Plaintiffs' claims and allegations in this case and the topics disclosed in her deposition notice." (Dkt. #30 at p. 5).

The Court held a hearing on the Motion for Sanctions on June 5, 2015 (Dkt. #39). On July 14, 2015 the Court entered an Order granting Plaintiffs' Motion for Sanctions, and ordered Defendant to produce a competent corporate representative with personal knowledge of the topics and ordered Defendant to produce requested documents contained in Plaintiffs' Deposition Notice of Corporate Representative pursuant to Rule 30(b)(6) (Dkt. #44).

Plaintiffs made a strategic decision not to depose a second corporate representative as a witness (Dkt. #52).[15] Therefore, Janati remained the corporate representative sitting at Defendant's table and testifying at trial as a fact witness (Dkt. #62). Janati's trial testimony regarding several important aspects of the case drastically differed from her testimony at her deposition. *See* Trial Tr. 9/10/15 at 58:15-59:14 (testifying during her deposition that she was unsure about whether or not the January 3 Communication qualifies as a QWR, then testifying at trial that she was sure that it does not qualify as a QWR); Trial Tr. 9/10/15 at 11:24-13:13 (stating during her deposition that Defendant had a written policy in December 2013 for identifying QWRs, and stating during trial that Defendant did not have a written policy at that time); Trial Tr. 9/10/15 at 16:4-17:1 (stating that as of November 25, 2013, the total amount of the whole loan was roughly $600,000 although during her deposition she testified that she did not know); Trial Tr. 9/10/15 at 29:4-19 (acknowledging that she did not know how much Plaintiffs were behind on payments as of November 2013 in her deposition, even though she prepared for the deposition, but stating now that they owed about forty-four thousand dollars in November 2013); Trial Tr. 9/10/15 at 22:8-23:7 (stating that during her deposition she stated that

---

[15] Plaintiffs persuasively argued that Defendant should not be allowed to benefit from not complying with Rule 30(b)(6). FED. R. CIV. P. 30(b)(6).

on May 28, 2013, Plaintiffs made a payment of over $6,000 on their account, but after the deposition she researched it and found out that the payment was returned to the homeowner). Additionally, during trial she was evasive and nonresponsive.[16]

When the jury was allowed to ask Janati questions,[17] the following exchange occurred:

The Court: Then, ma'am, for the fall of 2013 how were the procedures for handling QWRs communicated to the other employees responsible for responding to the QWRs, prior to the issuance of the written policy?[18]

A. Other employees would not respond to QWR. It needed to fit the specific of QWR. And in this case, the December 16 letter from the attorney fit into the QWR. It did go to Customer Relation Officer. They logged it in. They worked it, and they responded to every question that they have.

The Court: Okay. So are you saying you make that decision? I mean, that's what I'm trying to understand I guess and I think the jury is trying to understand, is you

---

[16] *See* Trial Tr. 9/10/15 at 23:8-17 (refusing to acknowledge the fact that she said "I don't know" several times in her deposition even after the attorney told her that she said that phrase 116 times in her deposition, and instead repeatedly telling the lawyer he would have to point it out to her in the deposition transcript); Trial Tr. at 9/10/15 20:23-21:22:8 (stating that she could not be sure if her deposition testimony was correct because she did not know if during the deposition she had examined the relevant documentation); Trial Tr. 9/10/15 at 26:1-28:7 (unable to state how much Plaintiffs paid in October of 2013 and saying that she was not smart enough to retain the numbers and dates she was asked about); Trial Tr. 9/10/15 at 19:16-20:22 (refusing to say that she understood that Plaintiffs' contention was that they never received an adequate accounting, even though she had stated that she understood this during her deposition); Trial Tr. 9/10/15 at 31:12-32:13, 32:22-33:2, 33:9-34:1 (acknowledging that she could have brought documentation with her to assist her in answering questions, after stating several times that she could not answer Plaintiffs' counsel's questions because she would have to check the records).

[17] The Court allowed jurors to ask questions of the witnesses. The procedure for doing so is explained to the jury during the Court's preliminary instructions. Each juror is given a blank question form. If, during a particular witness's testimony, they believe that there is something important that they would like to ask that witness, they may write their question on the form. After the attorneys have completed their questioning of the witness, the Court asks each juror to pass their form to the Court Security Officer. They are instructed to pass a form even if it is blank. By doing this, the identity of the juror asking a question will not be readily apparent. The Court then has the attorneys approach the bench and the Court reviews the questions with the attorneys out of the hearing of the jury. The Court then decides whether it believes each question is appropriate. The Court then asks the witness the questions it believes are appropriate, and the witness will then answer the questions for the jury. After the witness answers all of the juror questions, the Court allows the attorneys, if they desire, to ask any follow-up questions. The jury is told not be offended if the Court does not ask their question, or rephrases it. The jury is also told that the Court hopes that by allowing jurors to ask questions, they will be more engaged in the proceedings and get the information they need to reach a just verdict. The jury is instructed not to feel compelled to ask a question if they do not feel it is necessary. The jury is also instructed that they should not be afraid to ask a question if they believe it will help them better understand a witness's testimony. They are told that their questions should be limited strictly to the witness's testimony, and not to ask questions that are unrelated to the specific testimony of that witness. The jury is informed that the Court will decide whether a question is appropriate and whether it should be asked. The jury is instructed that they should not draw any adverse inference against any party should the Court decline to ask a question or re-phrase a question that has been submitted.

[18] This question was submitted by the jury. The rest of the questions included herein were follow-up questions that the Court asked in an attempt to clarify Janati's response to the jury question.

have no written policy at the time you're addressing these letters and you're making it sound like, well, okay, if it's QWR, we respond. What procedures are there in determining when it qualifies as a QWR?

A. If -- if it is made to –

The Court: Because, ma'am, the Plaintiffs are asserting that all these letters sent qualified as a QWR. That's their assertion.

A. And it doesn't. One of them, it qualifies. So there's three important factors about QWR.

The Court: But, ma'am, the question I'm trying to figure out is tell me what procedures are there to determine what qualifies as a QWR.

A. I'm sorry?

The Court: You're making the statement that this isn't, but how? Why?

A. Why? Okay. So first, mailed to the correct address. Second, Attention Customer Relation Officer. Third, your question should be in regards to servicing of the account. We are the servicer of the account. So ask for accounting, ask for -- you know, if you think there has been an error made. So if it does go to the correct address, Attention Customer Relation Officer, and it does address or question about the servicing of the account, it does go to Customer Relation Officer, they open, they log in, and they respond.

(Trial Tr. 9/10/15 at 47:8-48:20).

After the jury questions were complete, Plaintiff's counsel asked Janati follow-up questions, and the following exchange occurred:

Q. Will you agree with me that that January 3rd letter was a QWR? The letter that was previously up here, not the response. The letter that was just on the screen for 15 minutes.

A. No, sir, that was not a QWR.

Q. Okay.

A. Would you –

Q. Why was that not a QWR?

A. I read it carefully. Every single paragraph, if you want to put it up, it was explained in the previous letter. It more looked like the previous attorney didn't agree with Nationstar. Every single item was addressed with the letter that we sent to them with all those attachment. She is re-questioning me. She is just I don't agree with you, I don't agree with you, when I provided the document to show how many month, what is this, what is this. Everything was in that package.

Q. Okay. Yes or no, do you think the January 3rd letter was a QWR?

A. No, sir.

Q. Okay. In your deposition you told me under oath you did not know whether or not that letter was a QWR, right?

A. I said back then I –

Q. But now today you have changed your testimony and it is a QWR, right?

A. It is not.

Q. Oh, it's not. I get confused. You answer so many different ways, I can't remember which one it is.

A. Well, let me clear it. One letter, December 16 letter that we responded, it went to Customer Relation. It got logged in. They followed the procedures and they provided everything that they ask. One letter was QWR. The January 3rd was the follow-up of that, and we can go paragraph by paragraph just so I can explain that every question that Ms. Sara was asking, it was the same question from the December 16 that it was responded. So I'm telling you the January 3rd is not QWR. We already provided those information to the attorney.

Q. During your deposition you didn't know whether or not the February 11th letter was a QWR either, did you?

A. No, I didn't know and I explained.

Q. Okay.

A. I researched it.

The Court: Let me just ask a question. How did you research it? So you're in that department. You followed the oral procedures, whatever those are, to make these decisions. Of course, now you have a written policy. So at the time of your deposition, those policies were in place. The written policies were in place I believe at the time of the deposition. That's correct, right? Make sure that counsel –

Mr. Hughes: Yes.

The Court: Okay. So how would you not know at the time of your deposition whether those qualified as a QWR? You're the corporate representative at the deposition. You're the corporate representative. Why would you not know whether that qualified as a QWR at that point? That's your job. Why would you not know?

A. I'm sorry.

The Court: No, that's not sufficient. That's not good enough. Why do you not know?

A. We do have a -- I am not Customer Relation.

The Court: So why should we believe you now when you say it's not one?

A: I'm sorry?

The Court: Why should we believe you now that it's not a qualified written request when your job at the deposition as the corporate representative for the Defendant, you're saying you don't know at the deposition? After you already had written policies in place at the time of your deposition, you're saying you don't know if those are qualified written requests. But today you're saying no, they're not. Tell me how we're supposed to believe one or the other. And I don't want to hear I'm sorry. You're the -- you work for the company. How is the jury supposed to assess this?"

A. I went back and researched it, so I –

The Court: How did you research it?

A. Well, you know, I went back and I talked to somebody who works for Customer Relationship and I reverified that -- Your Honor, I said that one of them was treated as a QWR, the letter before it. So the letter before it was treated as QWR, and I didn't know if the second letter would still be a QWR when I already -- my company already responded to the previous one, so it was repetition. I didn't know if it is a repetition of the question, would it be again a QWR.

(Trial Tr. 9/10/15 at 57:23-61:6).

After the exchange above occurred and after a break, Defendant's counsel made a motion for the Court's recusal outside the presence of the jury.[19]

> Mr. McInnis: It's our client's position that because of the questioning, specifically the questioning that went beyond that of the jurors, that it evidenced partiality and questioned the credibility of the witness that crossed the line to advocacy and may not be cured by the instruction, so we would respectfully ask for recusal.

(Trial Tr. 9/10/15 at 104:9-14). The Court denied the motion to recuse (Trial Tr. 9/10/15 at 104:15-16). After further discussion of the verdict form, the Court again addressed the motion for recusal thus,

> The Court: . . . And also going back to your request for recusal, I think the Federal Rules allow me to question witnesses and allow me to comment on the evidence. There's nothing improper about that. So explain to me again why you think that I'm not being -- somehow being impartial in this.

> Mr. McInnis: Yes, sir. Certainly 614 allows Your Honor to ask questions, but there is case law that says where that evidences a partiality or crosses the line to advocacy as with regard to in this specific instance the statement of how am I supposed to believe you, how are we supposed to believe you now, those type of comments are the basis of the motion, Your Honor.

> …

> Mr. Hughes: First of all, all you were doing was reading the jurors' questions, and then the witness didn't answer. And I believe all you were doing was instructing her that she needs to answer the question and that's the extent of what I believe you were doing.

> The Court: I agree. I mean, you put a witness on that did a horrible job and wouldn't respond, gave a lot of non-responsive answers and then also answered questions that weren't being asked. So I did do that, but that doesn't show my partiality. It's trying to get the witness to answer the questions that were being asked, both by counsel as well as the jury.

(Trial Tr. 9/10/15 at 105:7-106:8).

The Court's questioning of Janati benefitted the jury by clarifying her previous (nonresponsive and evasive) answers, and it is expressly authorized by the Federal Rules of

---

[19] Defendant has not raised the issue of recusal again in its current motion (Dkt. #89).

Evidence.  *See* Fed. R. Evid. 614(b).  Rule 614(b) of the Federal Rules of Evidence permits judges to question witnesses.  *Id.*  "A trial judge has wide discretion over the 'tone and tempo' of a trial and may elicit further information from a witness if he believes it would benefit the jury." *United States v. Saenz*, 134 F.3d 697, 701-02 (5th Cir. 1998).

The Fifth Circuit has previously stated that a trial judge's questioning of witnesses is permissible if aimed at clarifying the evidence or managing the trial. *United States v. Williams,* 809 F.2d 1072, 1086 (5th Cir. 1987).  The Fifth Circuit has stressed that its "review of the trial court's actions must be based on the entire trial record" and it will conclude a court's questioning warrants reversal only when the "cumulative effect" is substantial and prejudices the defendant. *United States v. Saenz*, 134 F.3d 697, 702 (5th Cir. 1998).  When determining whether reversal is warranted, the Fifth Circuit reviews such factors as the context of the questions, the person to whom the questions were directed, and the presence of curative instructions.  *Id.*  However, "[t]he mere fact that there were more interruptions on one side or the other" and "[t]he judge's elicitation of 'damaging information' in the course of questioning witnesses" are "insufficient to demonstrate that the judge was engaged in misconduct."  *Richmond v. Horace Mann Ins. Co.*, 480 F. App'x 747, 749-50 (5th Cir. 2010) (per curiam) (citing *United States v. Lankford*, 196 F.3d 563, 572-73 (5th Cir. 1999).

In the current case, the record indicates that the Court was seeking clarification (Trial Tr. 9/10/15 at 106:2-8).  Additionally, the Court included a curative instruction in the jury charge.[20] Janati's testimony was inconsistent, and she had failed to adequately explain the inconsistency

_____

[20] The Court's curative instruction in the Jury Charge stated that,

> If I have given you the impression during the trial that I favor either party, you must disregard that impression. If I have given you the impression during the trial that I have an opinion about the facts of this case, you must disregard that impression. You are the sole judges of the facts of this case. Other than my instructions to you on the law, you should disregard anything I may have said or done during the trial in arriving at your verdict.

(Dkt. #74 at p. 1).

(Trial Tr. 9/10/15 at 57:23-61:6). The Court asked why her testimony had changed, and then when she did not give a satisfactory answer, the Court pressed the witness to explain further so that the jury could evaluate whether her deposition testimony or her live testimony was more reliable. The Court's line of questioning did not elicit "damaging information." Indeed, the information that was elicited might have been helpful to Defendant's case because it explained the inconsistency in Janati's testimony.

When analyzed in the context of the entire record, the cumulative effect of the Court's questioning did not prejudice Defendant. *See United States v. Deason*, 14-10461, 2015 WL 4709584 at *9 (5th Cir. Aug. 7, 2015) (per curiam) (stating "it was not unreasonable for the trial court to seek clarification of [Defendant's] somewhat circuitous testimony to aid the jury" and finding no plain error even though the court engaged in "several salty exchanges with both sides" during trial); *Richmond*, 480 F. App'x at 749-50 (finding that a court's questioning of one party's witnesses more actively, combined with the fact that its questioning seemed to point out flaws in that party's case, did not constitute plain error and that the questioning was "more focused on ascertaining the truth and avoiding the needless consumption of time.") (citation omitted); *United States v. Achobe*, 560 F.3d 259, 272 (5th Cir. 2008) (holding that although the court's questioning "suggests antagonism or incredulity" toward the defendant's testimony, there was not clear error because the trial was large and there was a significant amount of evidence in favor of the government's argument); *United States v. Lankford*, 196 F.3d 563, 572-73 (5th Cir. 1999) (finding no misconduct when the trial court interrupted the defendant's examination of key witnesses almost sixty times, while only interrupting the Government's examination of the same witnesses twenty times); *see also McMillan v. Castro*, 405 F.3d 405, 412 (6th Cir. 2005) (finding

no misconduct even when the trial court's questioning "bordered on condescending"). Therefore, the Court's questioning of Janati was proper and a new trial should not be granted.

## CONCLUSION

It is therefore **ORDERED** that Defendant's Renewed Motion for Judgment as a Matter of Law, Motion to Alter or Amend Judgment, and Alternatively, Motion for New Trial (Dkt. #89) is hereby **DENIED**.

**SIGNED this 21st day of April, 2016.**

_____
AMOS L. MAZZANT
UNITED STATES DISTRICT JUDGE